**Marguerite A. CAPANO, Individually and as Executrix of the Estate of Louis Capano, Deceased, Plaintiff,**

v.

**BOROUGH OF STONE HARBOR, a Municipal Corporation of the State of New Jersey, the Stone Harbor Beach Patrol, Arden W. Hand, Chairman of the Stone Harbor Beach Patrol, James G. Wood, Mayor of the Borough of Stone Harbor, Sam Wierman, Beach Patrol Captain, Bill Forsyth, Beach Supervisor, jointly, severally and in the alternative, Defendants.**

Civ. A. No. 80–1962.

United States District Court, D. New Jersey.

Jan. 25, 1982.

 

Ronald A. Graziano, Alan H. Sklarsky, Tomar, Parks, Seliger, Simonoff & Adourian, Haddonfield, N. J., for plaintiff.

William M. Balliette, Jr., Cafiero & Balliette, Wildwood, N. J., for defendants.

## OPINION

GERRY, District Judge.

Plaintiff instituted this civil rights action for injunctive relief and damages after the defendants failed to establish a public swimming beach at 113th Street in the Borough of Stone Harbor. Plaintiff seeks the right to be able to swim in the waters abutting the 113th Street beach. However, plaintiff contends that she is not seeking a mandatory injunction requiring the borough to undertake any action with regard to her, but rather moves the court to enter a restraining-type order which would bar the Borough from interfering with plaintiff's use of the waters in front of her home. Although the area to the north of 113th Street contains the only private beach property in Stone Harbor, consisting of a convent and its beachfront extending to the high waterline, plaintiff does not seek to affect the use of that property or to make use of that property.

Plaintiff also complains of discriminatory treatment in that the nuns which occupy the convent have been permitted to swim in the waters in the vicinity of 112th Street to the exclusion of all others and have been provided with one municipal lifeguard for their protection. Such treatment, plaintiff maintains, violates the equal protection clause.

In addition to challenging the failure of the borough to establish a beach at 113th Street on equitable estoppel grounds, plaintiff alleges that the establishment of protected' beaches by the Borough of Stone Harbor as well as the decision not to establish a beach at 113th Street violate due process; protected beaches have been established without utilization of any standards for determining the manner in which Borough resources (principally manpower in the form of lifeguards and safety equip-

ment) should be allocated; moreover, the standards which were employed. in determining whether to establish a beach at 113th Street have allegedly not been applied to other beaches.

Finally, plaintiff contends that the conduct of the Borough in permitting and encouraging the nuns to use the beach in the vicinity of 112th Street violates the Public Trust Doctrine. Under such doctrine, all lands below the mean high tide mark not conveyed to private parties belong to the public. As a result, governmental entities regulating the use of such lands must do so in an even-handed manner, opening beaches to all on equal terms.

Jurisdiction over this action is grounded in 28 U.S.C. § 1332, diversity of citizenship, and 28 U.S.C. § 1343, which grants jurisdiction over actions involving violations of 42 U.S.C. § 1983.

The court conducted a non-jury trial of this action on June 9–12, 1981. The court has reviewed the testimony at trial, along with the exhibits introduced into evidence, the depositions, the pleadings and the submissions of counsel, and makes the following factual findings:

1. Plaintiff is and was at all times relevant to the instant action a citizen of the State of Delaware. (T. 34.)

2. Defendants are the Borough of Stone Harbor, a municipal corporation; the Stone Harbor Beach Patrol, a municipal entity of the Borough of Stone Harbor; Arden W. Hand, Chairman of the Stone Harbor Beach Patrol and a resident of Stone Harbor, New Jersey; James G. Wood, Mayor of Stone Harbor, and a resident of Stone Harbor, New Jersey; Sam Wierman, Beach Patrol Captain, and a resident of Cape May Courthouse, New Jersey; and Bill Forsyth, Beach Supervisor, and a resident of Norristown, Pennsylvania. (Complaint, ¶¶ 2–7; Answer ¶ 2; Wierman Dep. 38.)

3. Between August 28, 1978 and September 6, 1978, the Borough Clerk of the Borough of Stone Harbor had arranged to advertise that the Borough would accept bids on certain lots in the Borough at a public auction to be held on September 9, 1978. (P–2.)

4. The advertisement appeared in the Cape May County Gazette-Wildwood Leader, Cape May County Times-Seven Mile Beach Reporter. (P–2.)

5. The advertisement listed the block and lot numbers of the properties to be auctioned. It did not contain any further description of the lots or their surrounding environs. (P–2.)

6. The purpose of the advertisement was to notify interested parties of the availability of the properties and not to provide an exhaustive account of the recreational facilities available in the Borough. (P–2.)

7. The advertisement did not designate the beaches at which swimming was permitted in the Borough of Stone Harbor. (P–2; T. 48.)

8. Plaintiff and her husband Louis Capano (now deceased) were desirous of purchasing a beachfront lot. The Capanos owned a home in North Wildwood. However, Mr. Capano, who was sick, was unable to walk to the water to swim because of the depth of the beach in Wildwood. (T. 58–59.)

9. The Capanos' principal objective in seeking to purchase a lot in Stone Harbor was to obtain a property from which Mr. Capano could use and enjoy the beach and ocean. (T. 58–60.)

10. Prior to the auction on September 9, 1978, the Capanos visited the 113th Street area to look at the lot for sale. They observed the beach and noted that people were in the water swimming, and two lifeguards were on duty. (T. 35–36.)

11. They also observed a sign at the end of 113th Street which contained a number of prohibitions but which did not prohibit swimming at that location. (T. 38; P–1.)

12. The Capanos visited the area on more than one occasion, all times in the afternoon, and each time they observed persons swimming on the beach. (T. 40, 46.)

13. Plaintiff's son, Joseph Capano, also visited the lot before the auction on three

occasions: once to look around, once to do some test digging, and a third time to shoot elevations, each time in the late afternoon. (T. 275–276.)

14. On the day that Joseph Capano shot elevations, he went for a swim after he had completed his work. There were no lifeguards on duty at the time, although there was a lifeguard stand on the beach pulled up by the dunes. Other people were swimming at the time, but not many. (T. 277–280.)

15. Prior to the auction, the Capanos did not seek to examine official records and did not ask any one, even a member of the beach patrol, to determine whether swimming was permitted at the 113th Street Beach. (T. 94–95.)

16. Plaintiff attended the auction on September 9, 1978 with her husband and son. (T. 48–53, 282.)

17. Prior to the start of the auction, the Mayor of Stone Harbor, Mayor Wood, a defendant herein, outlined the rules for the bidding and sought to answer questions from the floor. (T. 53; D–9.)

18. The Mayor did not describe the recreational facilities available in Stone Harbor. (T. 53.)

19. The Capanos did not, at that time, inquire as to whether swimming was permitted at 113th Street. (T. 53.)

20. The Mayor made no representations as to whether swimming was or was not permitted at 113th Street. (T. 500.)

21. At the auction, the Borough sold six lots. It did not auction any rights to the use of the beach or otherwise include beach use as a component of the properties sold. (T. 49; P–2; P–3; D–1; D–9.)

22. The Capanos successfully bid on lot number six, the last property auctioned, at the price of $165,000. (T. 51–52; T. 283; D–9.)

23. At the conclusion of the bidding, Mr. Capano gave a deposit of 15% and signed an agreement to purchase the property. (T. 64; D–1.)

24. While Mr. Capano was giving the deposit, Mrs. Capano learned from a neighbor that swimming was not permitted at 113th Street, and that the beach in the vicinity of 112th Street was only for nuns who owned a convent and beachfront between 111th and 112th. (T. 64.)

25. When Mr. Capano returned from giving the deposit, he was informed by his wife of the swimming restriction. (T. 294.)

26. Mr. Capano then approached the Mayor and asked for the return of his money on the ground that swimming was not permitted at 113th Street. (T. 65–66.)

27. Mr. Capano was very upset at the time of his conversation with the Mayor. (T. 66; T. 295.)

28. Present during the conversation between Mayor Wood and Mr. Capano were Joseph Capano, Carlos Leffler, Mrs. Capano and Councilman Clelland. (T. 67; T. 151; T. 297, 302; T. 500–501.)

29. Mayor Wood told Mr. Capano that his money could not be returned and that the sale was completed and finalized. (Wood Dep. 129, lines 10–15; See Final Pretrial Order—Admissions and Stipulations.)

30. There is a conflict in the evidence as to what the Mayor told Mr. Capano regarding the establishment of a bathing beach at 113th Street. Mrs. Capano testified that the Mayor told her husband that it would be taken care of and that they would be allowed to swim. (T. 66.) Joseph Capano stated that the Mayor told his father not to worry, that they would straighten it out so that they (the Capanos) could swim. (T. 297.) Mayor Wood and Councilman Clelland testified that he (the Mayor) stated that he would look into the matter and if it was possible to put a beach at 113th Street they would probably do so. (T. 389–390; T. 501.) Mr. Leffler testified that the Mayor told Mr. Capano that "it would be worked out." (T. 155.)

Because Mr. Leffler is the only disinterested party to this litigation and because in July 1979 Thomas Capano, son of plaintiff, wrote to the Borough Solicitor informing

him that his father had been assured that "something would be worked out" (P–16), the court credits the account of Mr. Leffler which accords with the representation of plaintiff's attorney in July 1979 as to what was said to plaintiff and finds that the Mayor told Mr. Capano that "something would be worked out."

31. After his conversation with the Mayor, Mr. Capano ceased his objection to the purchase and did not attempt to get his money back. (T. 462.)

32. The Capanos did not seek to obtain any written assurances from the Mayor. (T. 145.)

33. At the time the Mayor told the Capanos that something would be worked out, he did not know that there were jetties located at 111th and 114th Streets. (T. 390, 459.)

34. Although the Mayor knew that he did not have the authority to bind the Council to establish a beach at 113th Street, he believed that he could conduct an investigation and was not aware of any impediments to the establishment of a beach there. (T. 445, 459.)

35. The Mayor's failure to take steps with Council or otherwise regarding the establishment of a beach at 113th Street immediately after the sale was due to inadvertence and the fact that the swimming season was over. (T. 447, 459–62.) However, such inadvertence does not render Mayor Wood's statement that "something would be worked out" a misrepresentation. The Mayor did seek to bring the matter before Council after it was brought to his attention again by the Capanos. (T. 392–394.)

36. There is no evidence that Council as a body knew of Mayor Wood's statements to the Capanos in September 1978. The Mayor did not mention to Council at the time the sale was confirmed that one of the bidders had asked for his money back. (T. 474.)

37. Although Councilman Clelland was present during the conversation between Mayor Wood and Mr. Capano, there is no evidence that he was attending the auction as an agent of Council or that he was charged with the responsibility of reporting on the events of the auction to Council. Thus, there is no basis for imputing the knowledge of Councilman Clelland to Council as a whole. The knowledge of one member does not, on the facts before the court, constitute knowledge on the part of the other five members of Council.

38. After the auction and without obtaining any further assurances from either the Mayor or the Borough nor any written assurances, the Capanos went to closing on the lot purchased at auction, and thereafter in December of 1978 entered into a contract to build a house on that lot. (T. 112; T. 145; P–5.)

39. Construction of the home was begun in January 1979 and was semi-complete by August of that same year. (T. 308, 310; D–6.)

40. Prior to and during construction, Mr. Capano did not take any action with respect to the establishment of a beach at 113th Street until June or July of 1979. (T. 333–34.)

41. In the latter part of June 1979, Ralph Evans, builder of the Capano home, spoke with Mayor Wood about the swimming situation at 113th Street. (T. 393.)

42. Based upon this request, the Mayor asked the Lifeguard Captain and the Beach Supervisor to prepare a list of reasons why a swimming beach should or should not be established at 113th Street. (T. 394.)

43. The recommendations of the Lifeguard Captain and the Beach Supervisor were presented to the Council at its meeting on July 10, 1979. (P–6; P–7.)

44. Based upon these recommendations, the Council voted not to establish a beach at 113th Street. (P–7.)

45. There is no evidence in the record that, at the time of the July 10, 1979 Council meeting, the Council as a whole was aware that the Capanos were interested in the establishment of a beach at 113th Street.

46. On July 24, 1979, the Capanos presented Council with a citizen's petition for a beach at 113th Street, and the matter was reconsidered by Council. (D–4; P–8.)

47. The petition did not state that the Mayor had promised to establish a swimming beach at 113th Street. (D–4.)

48. There is no evidence in the record that the Capanos told Council at the meeting of July 24 that the Mayor had promised to establish a swimming beach at 113th Street.

49. The Council, again relying on the recommendation of the Lifeguard Captain and the Beach Supervisor, voted against the establishment of a swimming beach at 113th Street. (P–8.)

50. On July 26, 1979, plaintiff's son Thomas, an attorney, wrote to the Borough Solicitor, informing him of plaintiff's grievances and the Capanos' intent to file suit for rescission, damages and declaratory judgment. (P–16.)

51. Plaintiff served no other notice on the Borough prior to filing suit in June of 1980.

52. The Borough maintains beaches at 83rd, 87th, 90th, 94th, 96th, 100th, 103rd, 105th, 108th, 117th and 119th Streets. (T. 518.)

53. Jetties in Stone Harbor are located at 84th, 92nd, 98th, 106th, 111th, 114th, 122nd and 127th Streets. (P–22.)

54. The 112th–113th Street beach area is the only area in Stone Harbor where two jetties are located within 3 blocks of one another. (P–22.)

55. The jetties at 114th, 122nd and 127th Streets are known as fishing jetties because they are constructed differently than other jetties: they are wider and have a flat, concrete top. (T. 557.)

56. The existence of a fishing jetty at 114th Street is an obstacle to the establishment of a beach at 113th Street. The presence of fishing lines in the water off the jetty make it impossible to establish a beach within one block of the jetty. (T. 559; P–6.)

57. The bathing beaches in Stone Harbor are protected by lifeguards, seated on stands situated on wet sand at the water's edge. (T. 505.)

58. Only two bathing beaches in Stone Harbor are designated in locations within two blocks of a jetty: the 83rd Street beach (84th Street jetty); and the 105th Street beach (106th Street jetty). However, those designated locations are the locations of the beach telephones rather than the locations of the bathing beaches. In actuality, the 83rd Street beach is located from 1½ to 2 blocks from the 84th Street jetty, and the 105th Street beach is located at 104th Street. (T. 595.)

59. Plaintiff submitted the expert testimony of Eric Mood to show that the beach area between 111th and 114th Streets is safe for swimming. The court rejects this testimony as based on a weak foundation. Dr. Mood did not visit the beach during the bathing season, spent only a few hours at the beach, on a relatively calm day, did not go into the water, and did not consult with any beach personnel. Instead, the court credits the testimony of Sam Wierman, Beach Captain, who has spent 13 years on the beaches of Stone Harbor, 4 summers as Beach Captain, 3 years as a Lieutenant, and 6 years as a Guard. (T. 554.)

60. The existence of jetties creates problems for the lifeguards with respect to the location of swimming areas. Such areas cannot be located too close to the jetties because of the risk that swimmers will get thrown up on the rocks before guards are able to reach them to effect a rescue. (T. 557.)

61. There are also special water conditions which exist around a jetty: the waters are more turbulent; there are strange currents and trenches. (T. 559.)

62. Washouts, or localized areas of turbulent water which are difficult to swim against, occur with a particular degree of regularity in the area between 111th and 113th Street. (T. 559–561.)

63. Washouts present a problem in that area because of limited beachfront prevent-

ing the guards from effectively moving the beach around the washout. (T. 568–569.)

64. The guards make it a practice of keeping swimmers from 1½ to 2 blocks from jetties. (T. 568.)

65. In the event of a washout at 113th Street, it would not be possible to move the beach around the problem area without incurring problems with the jetties. (T. 566–573; T. 574–580.)

66. In declining to establish a bathing beach at 113th Street, the Council relied upon the recommendation of the Lifeguard Captain and the Beach Supervisor. The recommendation contained seven criteria, all of which were considered by the Council and all of which counselled against the establishment of a beach at the location in question. (T. 399–401; T. 503–504; T. 526–527; P–6.)

67. The criteria include: (a) the existence of a fishing jetty at 114th Street; (b) the existence of dangerous currents around the jetty; (c) the existence of a private beachfront occupying some 200 feet of beach area, limiting the usable area for establishing a beach to 560 feet; (d) the lack of population density in the area of 113th Street partly due to the bird sanctuary between 2nd and 3rd Avenues; (e) the necessity of adding at least 2 or 3 guards to the payroll to protect the beach; (f) the necessity of adding a boat and a trailer to the beach to protect it; (g) the necessity of installing a beach phone to link the beach with beach patrol headquarters. (P–6.)

68. In addition, the Council considered the fact that there was no overcrowding of bathing beaches in Stone Harbor, and no evidence that more bathing beaches were needed. (T. 523.)

69. The Council concluded that the addition of a public bathing beach was a luxury that the taxpayers could not afford, particularly in an area where so few taxpayers would be benefited. (T. 523.)

70. The Convent of the Sacred Heart owns property in the vicinity of 111th–112th Streets in Stone Harbor, including beachfront land, extending to the highwater mark. (D–11; D–12.)

71. The Borough has permitted the nuns at the convent to use the beach in the vicinity of 112th Street for at least the last 25 years and has in the past provided them with one lifeguard. (T. 403; T. 528.)

72. The nuns have used the public dry sand beach as well as their own private land when swimming. Prior to the July 1979 Council meetings, the nuns' swimming beach was located at 112½ Street. (T. 41–42; P–12.)

73. In the summer of 1981, the Borough notified the nuns that it would no longer provide them with a lifeguard at taxpayers' expense. (T. 403.) However, the Borough is continuing to provide training to two lifeguards whom the nuns hire for their beach. (T. 528.)

74. Pursuant to an ordinance of the Borough of Stone Harbor, protected beaches (bathing beaches) are to be established by resolution of Council. (P–9.)

75. Defendants were unable to produce any resolution designating beach sites in Stone Harbor. Nor did defendants provide the court with the standards or evidence of the standards used for establishment and continued maintenance of designated beaches.

76. During the course of the trial, the Borough Council passed a resolution designating beaches. (D–16.)

77. Defendants provided no evidence as to the standards used in determining which beaches were to be designated.

78. Surfers are permitted to use the beach between 111th and 114th, except during the hours of 1–4 P.M. (T. 318; T. 581–582.)

79. Surfers are not as susceptible to the unsafe conditions in the water in this area because they are not swimming in it, have their surfboards on which to rest should they become tired, and are generally stronger swimmers than the average beachgoer. (T. 582.)

80. Residents of the 113th Street area swim at the beach there in the off season and in off hours. (T. 148–149.)

81. A list of designated bathing beaches is and has been maintained at the Borough Clerk's office, the Chamber of Commerce office and at the beach patrol headquarters. (T. 520.)

82. The designated bathing beaches in Stone Harbor have not changed in more than 16 years. (T. 518.)

83. The lifeguards have the authority to move the bathing beach one block in either direction. (D–16.)

■ Based upon the circumstances observed by plaintiff in the vicinity of 113th Street prior to the auction, plaintiff claims a right to damages and to injunctive relief based upon equitable estoppel. Plaintiff is correct that New Jersey law recognizes an obligation upon a vendor of real estate to make truthful representations. *See Tobin v. Paparone*, 137 N.J.Super. 518, 349 A.2d 574 (Law Div.1975) (King, J.). However, that obligation has not been extended by the court to non-verbal evidence of the surrounding environs. In *Tobin*, Judge King held:

> [a]lthough a vendor may be under no obligation to *speak* concerning the thing he would sell, yet if he undertakes to do so [i.e., to *speak*] he is bound not only to speak the truth in all he says but is equally obliged to tell every material fact within his knowledge which might materially qualify such statements as he may have made.

137 N.J.Super. at 524, 349 A.2d at 578 (emphasis added).

In the instant case, the evidence unequivocally demonstrates that defendants made no verbal representations to plaintiff as to the existence of swimming at 113th Street. In addition, this case is factually distinguishable from *Tobin* wherein the court found that the vendor had failed to disclose an anticipated future condition on the adjacent lot which was unique to that area of town, could not have been anticipated by plaintiffs, and because of its uniqueness, had to have an adverse effect on plaintiff's property. In the instant case, the Borough could not have known that the existence or non-existence of a swimming beach would render the property undesirable to plaintiff. Moreover, there is no evidence in the record to suggest that the mere existence of a lifeguard stand on the beach at 112th Street amounted to a nonverbal assertion that the Borough maintained a beach there. Specifically, the evidence does not suggest that plaintiff or any of her family perceived the lifeguard stand as a "municipal" lifeguard stand. Nor does plaintiff explain how they knew that the lifeguards were provided by the Borough. It is not readily apparent how one would distinguish visually between a municipal lifeguard and a private lifeguard, nor is there any testimony to suggest that any of the Capanos made such a distinction.

■ Plaintiff's contention that the failure of the Borough to disclose the swimming restriction constitutes a fraudulent representation is similarly without merit. As discussed earlier, *Tobin* only holds that failure to disclose may amount to misrepresentation where a vendor of real estate elects to *make representations* about the property. *Weintraub v. Krobatsch*, 64 N.J. 445, 317 A.2d 68 (1974), and the trial court decision in *Jewish Center of Sussex County v. Whale*, 165 N.J.Super. 84, 397 A.2d 712 (Ch.Div.1978), *aff'd*, 172 N.J.Super. 165, 411 A.2d 475 (A.D.1980), *aff'd*, 86 N.J. 619, 432 A.2d 521 (1981), are inapposite to the instant situation since the omitted disclosure involved a characteristic of the entity involved in the contract (in *Weintraub* a condition of property, and in *Whale* the moral and ethical character of a Rabbi in an employment contract). The condition complained of here was external to both the property and the contract to purchase signed by Mr. Capano. Moreover, the decision of the Supreme Court in *Whale* indicates that defendant's *affirmative misrepresentation* of his rabbinical experience and not his failure to disclose constituted equitable fraud and was thus grounds to rescind the employment contract. 86 N.J. at 625, 432 A.2d 521.

For the foregoing reasons, plaintiff has failed to demonstrate that defendants

**1264**

breached a duty to disclose the swimming restriction to her prior to or during the auction.

■ Plaintiff also complains that representations were made to Mr. Capano after the sale by Mayor Wood which were fraudulent and upon which plaintiff relied in going to closing and constructing her house. Plaintiff argues that because the Mayor, and the Borough by ratification of the sale, promised to establish a swimming beach at 113th Street, the Mayor and Council should be liable for misrepresentation and the Borough should be estopped from denying to plaintiff, her family and guests, the right to use the 113th Street beach for swimming.

Plaintiff's position has many shortcomings. First of all, the court has found that the Mayor did not promise to establish a beach at 113th Street, but merely said that something would be worked out. Although the Mayor through inadvertence neglected to seek a solution to plaintiff's problem immediately, the Mayor did seek to fulfill the Capanos' subsequent request for a beach by asking the Lifeguard Captain and Beach Supervisor to look into whether a beach should or should not be established at 113th Street.

Furthermore, since the Mayor did not assure plaintiff that a swimming beach would be established at 113th Street, his failure to procure such a beach cannot constitute a fraud.

Nor did the Mayor misrepresent the scope of his authority. The Mayor's statement was not calculated to lead and could not have led any rational individual to believe that he had the authority himself to designate swimming beaches. A statement that something would be worked out does not place the burden on the Mayor nor give the power to him to arrive at a solution. It also does not imply that the Mayor could act without the Borough Council.

■ Under New Jersey law, a cause of action for misrepresentation amounting to actual legal fraud consists of "a material representation of a presently existing or past fact, made with knowledge of its falsi-

ty and with the intention that the other party rely thereon, resulting in reliance by that party to his detriment." *Whale, supra*, 86 N.J. at 624, 432 A.2d 521. The scienter element (knowledge of falsity and intention to obtain undue advantage) does not have to be proved if plaintiff seeks only equitable relief. *Id.* at 625, 432 A.2d 521. Ordinarily, an action for misrepresentation cannot be predicated upon matters *in futuro*. *Ocean Cape Hotel Corp. v. Masefield Corp.*, 63 N.J.Super. 369, 380, 164 A.2d 607 (A.D. 1960). However, a false representation of an existing intention, i.e., a "false state of mind," with respect to a future event or action has been held to constitute actionable misrepresentation. *Samatula v. Piechota*, 142 N.J.Eq. 320, 323, 60 A.2d 86 (Ch.1948). In other words, the defendant must have no intention at the time he makes the statement of fulfilling the promise. Defendant's lack of intention may be shown circumstantially by his subsequent acts and by subsequent events or by evidence that the statement was impossible to fulfill based upon contingencies or circumstances known to the promisor at the time of the statement but unknown to the promisee. *Ocean Cape Hotel, supra*, 63 N.J.Super. at 381, 164 A.2d 607. "The intention of the promisor not to perform is not sufficiently established by mere proof of nonperformance; moreover, failure to perform does not impose upon the alleged promisor the burden of showing that his nonperformance was due to circumstances which arose after the making of the agreement." *Id.* at 382, 164 A.2d 607.

■ In the instant case, plaintiff has not carried her burden of demonstrating that the Mayor's statement that "something would be worked out" constituted a statement of the intention to undertake a certain course of conduct in the future. It is difficult to find an expression of intention in such a statement. Even assuming that the statement bound the Mayor to work something out in the future, the alleged promise is so vague and ambiguous as to be unactionable. *Cf. Roberts v. James*, 83 N.J.L. 492, 85 A. 244 (E. & A. 1912) (statement that certain property would be devel-

oped in the future only actionable because defendant made other false statements as to existing facts from which court could infer false state of mind). Moreover, there is no basis in the evidence upon which to conclude that the statement was false at the time it was made.

■ Plaintiff contends that the Mayor's failure to take immediate action demonstrates that the Mayor had no intention of fulfilling his promise to plaintiff. However, this court has previously found that the Mayor's failure to act immediately after the auction was due to inadvertence and to the belief that nothing could be done in the off-season when the beach personnel were away. Based upon this finding, the court can draw no negative inference from the Mayor's inaction. Plaintiff also argues that the Mayor's failure to take immediate action demonstrates that "he had no present intent of acting on his promise to plaintiffs." However, mere proof of nonperformance does not establish an intention not to perform. *Ocean Cape Hotel, supra.* Besides, the court has credited the Mayor's explanation of his inaction and has concluded that such inaction was not intentional nor due to an unwillingness to do something about the situation. When the Mayor was reminded of the Capanos' desire for a swimming beach, he sought to bring that matter before the Council. The matter was in fact considered by the Council. Such circumstances do not reveal a false intention or misrepresentation as to present intent.

■ Plaintiff contends that the Mayor's representation was dependent upon contingencies known to him which were unknown to the Capanos. However, plaintiff acknowledges and apparently accepts the Mayor's testimony that he was unaware of the conditions of the 113th Street beach which might preclude lifting the restriction. Thus, it is not clear to what contingencies the plaintiff refers. If the Mayor was unaware of the conditions at 113th Street, he could not possibly have known that it would not be possible to work something out and therefore did not misrepresent his present intentions. If the plaintiff refers to the contingency of Council's approval of the swimming beach, such a contingency should have been known to plaintiff. Moreover, the Mayor's alleged representation did not extend to Council so that any contention that his statement entailed an assurance that a swimming beach would be provided to plaintiff is unjustified and not supported by the record. As a result, the contingency of Council's approval is irrelevant to the Mayor's statement which did not encompass Council or in any way represent the supposed future conduct of Council. Even assuming that the Mayor did assure plaintiff that Council would approve the change, such a statement would not be actionable as a misrepresentation under *Whale* or *Ocean Cape Hotel* because it is not a statement of present or existing fact nor a statement of the *Mayor's* state of mind.

■ It appears from plaintiff's post-trial submissions that plaintiff's claim against the Mayor is a claim for damages under the New Jersey Tort Claims Act, N.J.S.A. 59:3–14.[1] Under *Whale,* in order to recover in an action at law for misrepresentation, the plaintiff must prove scienter. Plaintiff has not demonstrated that the Mayor knew that his statement was false at the time it was made nor that he sought to obtain undue advantage by the statement. The instant case does not involve fraud in the inducement of a contract as did *Whale, Tobin,* and *Ocean Cape Hotel.* At the time Mr. Capano sought assurances from the Mayor, he had already signed the agreement to purchase the property. In addition, the Mayor had already informed him that his money could not be returned and that the sale was completed and finalized. Therefore, the Capanos were not induced to enter the agreement by fraud, although Mr. Capano may have been persuaded not to breach the contract by refusing to go to closing on the basis of the Mayor's statement that some-

---

1. The letter of Thomas Capano to the Borough Solicitor of July 26, 1979 would appear to substantially comply with the notice requirement of the Tort Claims Act. *See Dambro v. Union County Park Comm'n.,* 130 N.J.Super. 450, 327 A.2d 466 (Law Div.1974).

thing would be worked out. However, such an ambiguous statement which provided the Capanos with no specific assurance as to future changes could not have furnished them with any basis for reliance as to the alleged object they sought. If the Capanos understood the statement as such, it is not because the Mayor gave them a specific promise of a bathing beach, but because they chose to be satisfied with trying to resolve the matter in the future rather than forsaking their deposit or undertaking further action to attempt to void the transaction.

█ Finally, there is no evidence in the record to provide the court with a basis for assessing damages, an essential element of a cause of action for misrepresentation. Although plaintiff testified that she seeks to be able to swim and has suffered some type of injury as a result of defendants' failure to establish a swimming beach in front of her house, there is no evidence to explain or quantify her injury. Plaintiff has thus not demonstrated that she has suffered recoverable damages and thus cannot be provided with a remedy at law.

For all of the foregoing reasons, plaintiff's claim for relief against defendant Mayor is without merit and recovery will be denied.

█ With regard to plaintiff's claim of ratification and estoppel against the Council, plaintiff argues that when the Council approved the sale of the six lots, it failed to repudiate the Mayor's promise to the Capanos and thus ratified it. Because the Council is chargeable with promising plaintiff a swimming beach, plaintiff contends, it should be equitably estopped from preventing plaintiff from using the beach for swimming.

Plaintiff's claim is unsupported by the evidence. There is no evidence to suggest that Mayor Wood attended the auction as an agent of Council or that Council ever authorized the Mayor to act on its behalf with respect to the designation of swimming beaches. Nor has plaintiff demonstrated that Councilman Clelland attended the auction as an agent of Council and that he was charged with the responsibility of reporting back to Council concerning the events which transpired there. Without such proof of agency, the knowledge of these two individuals cannot be imputed to Council. As the party urging this theory, plaintiff has the burden of proving that an agency relationship existed. Plaintiff's claim that it has satisfied its burden is based wholly on inference without evidence to support it.

Moreover, plaintiff acknowledges that in order to establish a basis for ratification and estoppel, it must show that the Council acted with *full knowledge* of the material facts involved. However, plaintiff has not established that, at the time that Council approved the sale of the lot to the Capanos, it as a body had full knowledge of the Mayor's communications with Mr. Capano. Plaintiff seeks to premise knowledge of the Council on the awareness of one of its members and of the Mayor. Since the Mayor is not a member of Council, is not entitled to vote at Council meetings except in the case of a tie, and in fact did not vote on the resolution which allegedly ratified his statements to Mr. Capano, the knowledge of the Mayor cannot be considered to have informed the vote of Council. In addition, plaintiff has not introduced any evidence to show that Mayor Wood was present at the Council meeting at which the resolution confirming the sale was adopted. Therefore, plaintiff cannot argue that a communication from the Mayor to Council, upon which this court could perhaps infer some knowledge, occurred prior to the adoption of the resolution. Finally, the Mayor testified on cross-examination that he did not mention to Council that one of the bidders at the auction had asked for his money back at the time of the Council meeting which confirmed the sales or prior thereto. Thus, the only evidence in the record indicates that the Mayor's knowledge was not conveyed to Council. On the basis of the record, the Mayor's awareness cannot be imputed to Council.

■ Plaintiff also takes the position that Councilman Clelland's observance of the conversation between the Mayor and Mr. Capano constitutes a basis for imputing knowledge to the full council. However, plaintiff has failed to point to any evidence which would demonstrate that Mr. Clelland's knowledge was conveyed to the whole Council prior to its approval vote. Nor has plaintiff cited to any case which holds that knowledge of one member of an elected body can constitute knowledge of all members. The court has previously rejected plaintiff's claim of an agency relationship. Consequently, there is no factual basis for inferring knowledge on the part of Council at the time that the confirmation resolution was adopted.

■ Even assuming that plaintiff could demonstrate an agency relationship between Clelland and Council, plaintiff has still failed to satisfy the standards for establishing ratification and estoppel. To "ratify" the unauthorized act of an agent means to approve and sanction, and presupposes knowledge or at least some altering circumstantial information on the part of the principal of the unauthorized action of the agent. *MacLeod v. Ajax Distributing Co.*, 22 N.J.Super. 121, 91 A.2d 635 (A.D. 1952). However, a principal cannot ratify an agent's act unless the agent purported to act on account of the principal. *Goldfarb v. Reicher*, 112 N.J.L. 413, 171 A. 149 (Sup. 1934), *aff'd*, 113 N.J.L. 399, 174 A. 507. "Although ratification may be implied by conduct, before ratification may estop a claim it must be shown that the officials acted with full knowledge of the material facts, either actually or as a matter of law." *Board of Educ. of Asbury Park v. Hoek*, 38 N.J. 213, 241, 183 A.2d 663 (1962).

If, as a member of Council, Councilman Clelland must also be viewed as an agent of Council, his presence at the auction does not grant plaintiff the right to ratification under the above cited authorities. Plaintiff does not seek to ratify any act of Clelland, the alleged agent, but an act of the Mayor, who is not a member of Council and whom plaintiff has not demonstrated was authorized by Council to act on its behalf.

Plaintiff has also failed to demonstrate that the circumstances of this case justify estoppel. Plaintiff has cited cases for the proposition that the New Jersey courts will impose equitable estoppel against a municipality where the interest of justice and fairness would be served. However, plaintiff has pointed to no case where an estoppel was imposed on circumstances similar to those of the instant case.

■ Estoppel is an equitable remedy available against a governmental entity where its misconduct or that of its officials acting strictly within the scope of lawful authority threatens to work a serious injustice against a person who has *reasonably* relied upon such conduct to his detriment. *American Training Services, Inc. v. Veterans Administration*, 434 F.Supp. 988, 1001 (D.N.J.1977) (Gerry, J.). However, a governmental entity will not be bound by ordinary errors or omissions in the conduct of its employees because there is generally a prevailing public interest in correcting erroneous interpretations of policy. Neither will the entity normally be bound by erroneous advice nor by entry into an agreement which is not in accordance with the law. *Id.* See *In re Hooper's Estate*, 359 F.2d 569, 577 (3d Cir. 1966) (Maris, J.). In *Rall v. Board of Ed. of the City of Bayonne*, 104 N.J.Super. 236, 246, 249 A.2d 616 (A.D. 1969) (Conford, J.), the court held that where the board had adopted a resolution that was contrary to its power under the Tenure Law, the action was totally unauthorized and void in legal effect and thus could not operate as an estoppel.

■ In the instant case, the Mayor has testified that he sought to commit himself as Mayor to the task of seeking a solution to plaintiff's difficulty and that he was aware at the time that he did not have the authority to bind Council. His statement that "something would be worked out" does not make a commitment on behalf of any other officer of government nor on behalf of the Borough. The Mayor did not in this statement hold himself out as acting for Council or as predicting Council's future

actions. Even if the Mayor had held himself out as an agent of Council, his conduct could not estop Council because, under *Rall,* his representation would have been totally unauthorized and void in legal effect.

■ In any event, plaintiff's conduct in relying on the Mayor's statement was not reasonable. If, as plaintiff has vociferously maintained throughout this controversy, the major objective in purchasing a property in Stone Harbor was to obtain a property with beachfront swimming, plaintiff should have obtained from the Mayor a more substantial commitment than that "something would be worked out." Not only did plaintiff fail to obtain an unambiguous assurance, plaintiff also went to closing and started construction without first making sure that the restriction had been changed or alternatively obtaining a written commitment that the restriction would be changed. In fact, Joseph Capano testified that when he asked his father in May of 1979 what had happened with regard to the swimming restriction, his father told him that he had not done anything about it. Plaintiff's conduct was also unreasonable because she and her husband relied on the statement of an official who had no authority to effectuate the change. Plaintiff has not demonstrated that she and her husband were ignorant of governmental decision-making or of the workings of Stone Harbor's form of government and therefore had to have been aware that a change in legislation could only be effected legislatively.

For all of the foregoing reasons, the court finds that estoppel against the Council and the Borough of Stone Harbor is not warranted by the circumstances of this case.

Plaintiff contends that the Council's failure to repudiate the Mayor's promise at the meeting of July 24, 1979 constitutes a ratification of it. Such a contention is apparently supported by plaintiff's proposed finding of fact # 26 wherein plaintiff states that at the July 24 meeting the Capanos informed Council of the Mayor's promises. However, the authority for this proposition in the record cited by plaintiff contains no mention of any statements by the Capanos

on July 24 regarding promises by the Mayor. Since there is no evidence that Council was informed at that time of any promises, no inference can be drawn from its failure to adopt a resolution repudiating the actions of the Mayor. If, as it appears from the record, Council was unaware of the Mayor's statements to Mr. Capano, it would have no reason to repudiate such statements. Moreover, Council's vote rejecting the establishment of a bathing beach at 113th Street is inconsistent with any implication of ratification. Therefore, ratification cannot be inferred from the actions of Council on July 24, 1979.

The court has rejected plaintiff's claims of misrepresentation and estoppel upon which plaintiff's alleged entitlement to injunction relief rests. Accordingly, plaintiff's request for an order enjoining the Borough from enforcing the no-swimming restriction against her, her family and guests will be denied.

Plaintiff challenges defendants' restriction on swimming at 113th Street, not only as applied to her but also on the ground that the policy violates various state doctrines and federal constitutional principles. First, plaintiff complains that defendants' refusal to allow anyone other than the nuns to use the public beach below the highwater mark between 111th and 114th Streets for swimming violates the public trust doctrine.

The New Jersey Supreme Court has recognized the unique suitability of oceanfront property for bathing and other recreational activities. *Lusardi v. Curtis Point Prop. Owners Assn.,* 86 N.J. 217, 430 A.2d 881 (1981). Because such property is unique and highly in demand, the court has expressed growing concern about the reduced "availability to the public of its priceless beach areas." *Van Ness v. Borough of Deal,* 78 N.J. 174, 180, 393 A.2d 571 (1978). At the same time, the court has given effect to a statewide policy of encouraging, consonant with environmental demands, greater access to ocean beaches for recreational purposes, a policy which arises from decisions of the court concerning the public trust doctrine, *Van Ness, supra,* from legis-

lation such as the Beaches and Harbors Bond Act of 1977, c. 208, and from the regulations (see N.J.A.C. 7:7E–1.1 to 9/23) promulgated by the Department of Environmental Protection pursuant to the Coastal Area Facility Review Act, N.J.S.A. 13:19–1 to –21.

The Public Trust Doctrine, a principle derived from English law, was originally designed to preserve for the use of all the public natural water resources for navigation and commerce. Sax, "The Public Trust Doctrine in Natural Resource Law: Effective Judicial Intervention," 68 *Mich.L.Rev.* 471 (1970). New Jersey limited the doctrine's application to tidal waters. *Cobb v. Davenport*, 32 N.J.L. 369 (Sup.Ct.1867). In *Borough of Neptune City v. Borough of Avon-by-the-Sea*, 61 N.J. 296, 310, 294 A.2d 47 (1972), the New Jersey Supreme Court extended the concept of the resources which the doctrine was designed to protect to include recreational uses and held that a municipality could not charge different fees for the use of its beaches, discriminating in favor of its own residents. In *Van Ness v. Borough of Deal*, 78 N.J. 174, 393 A.2d 571 (1978), the court held that a municipality could not limit its dedication of the use of a municipally owned open beach to residents of the municipality. While the municipality could, in its exercise of the police power and in the interest of public health and safety, adopt reasonable regulations as to the use and enjoyment of the beach area, *id.* at 179, where the beach had been dedicated to recreational uses including bathing, swimming, surf fishing and other shore activities, the municipality had to permit access to the beach to the general public as required by the Public Trust Doctrine, *id.* at 181, 393 A.2d 571. In *Lusardi, supra*, the court considered the relationship between the evolving doctrine and privately-owned beachfront property. The municipality had limited the use of private beach to those owners having adjacent residential property. Since only single family residences could be constructed on the beachfront, only owners of single family homes could utilize the privately owned dry sand for recreation. A property owners association owned an oceanfront lot, including dry beach area which it had been enjoined from permitting its members to use for recreational purposes. The *Lusardi* court held that the zoning ordinance which restricted that use was inconsistent with the statewide policy of encouraging optimum recreational use of dry sand beach areas along the Atlantic Ocean, but upheld the single family residence limitation.

■ The New Jersey cases establish a series of guiding policies. First of all, municipalities with public beaches within their limits cannot discriminate between residents and non-residents in charges for the use of those beaches. In addition, non-residents cannot be prevented from using municipally maintained beaches. Finally, municipalities cannot prohibit private property owners from using private beach lands for recreational purposes. If a municipality wishes to regulate activities on its beaches, its regulations must be reasonable and consistent with the Public Trust Doctrine.

In the instant case, plaintiff contends that defendants have permitted one class of residents to use the beach at 112th Street for swimming to the exclusion of all others. Such differential treatment, it is alleged, violates the Public Trust Doctrine.

■ The instant case does not fit neatly into the prior categories of municipal regulations found by the New Jersey Supreme Court to violate the Public Trust Doctrine. While the conduct of defendants does involve elements of exclusion which under *Neptune* and *Deal* would appear violative of the doctrine, the defendants have recognized the interest of the nuns, who own the dry sand beach area in front of their convent, to use their property for recreational purposes, a recognition which is consistent with *Lusardi*. However, the fact that defendants have permitted the nuns to swim in an area which belongs to the public and, at least in years prior to 1981, have provided a municipal lifeguard to protect that beach violates the policy of making recreational facilities available to all on an equal basis. In addition, defendants have claimed that the waters in this vicinity are unsafe for bathing; yet they have not refused to

permit swimming in the waters by the nuns. If, as defendants claim, the currents are too dangerous and the jetties are too close together to allow swimming, such a condition exists regardless of whether the swimmer is a nun, a resident or a non-resident.

██ The Public Trust Doctrine does not require defendants to permit swimming on all of the beach areas in Stone Harbor. The court in *Deal* expressly recognized the right of a municipality to adopt reasonable regulations for the use and enjoyment of the beach area. Moreover, N.J.S.A. 40:92–7.1 expressly delegates to a borough exclusive control over bathing and recreational facilities, safeguards and equipment and expressly authorizes a borough to make and enforce rules and regulations for the government and policing of such bathing facilities, safeguards and equipment. The statute also authorizes a borough, in order to provide facilities and safeguards for public bathing and recreation, including the employment of lifeguards, to make and enforce rules and regulations for the government, use and maintenance and policing of such facilities and safeguards, and to charge a reasonable fee for access to the beach. Thus, under the police power, defendants may establish those areas of beach where lifeguards will be provided and swimming permitted. However, once defendants permit swimming in an area of public beach, they cannot restrict the right of all who wish to partake in such swimming from doing so. *See Deal, supra.*

██ In the instant case, defendants have attempted to show that the nuns have a private beach and have been permitted to enjoy the full range of recreational activities on that beach. However, it is clear that the nuns do not own the rights to the beach beyond the mean high tide mark, and cannot exclude members of the public from the wet sand in front of their property during low tide. Despite this fact, defendants have allowed only the nuns to use the water between the 111th Street and the 114th Street jetties and have claimed that their reason for doing so is the unsafe condition of that area. If defendants seek to maintain that conditions are unsafe for

members of the public, they must likewise be unsafe for the nuns. Therefore, defendants must either prohibit all from swimming or, if it chooses to permit some members of the public to swim from the beaches between the two jetties, it must permit all members of the public to do so. Accordingly, the conduct of the defendants in refusing to establish a swimming beach in this area *or* to prohibit all from swimming there violates the Public Trust Doctrine.

██ As the court indicated earlier, defendants have failed to make swimming facilities in the waters between 111th and 114th Streets available to all on an equal basis. Such differential treatment is without a rational basis. Defendants' principal rationale for excluding members of the public is because of the unsafe conditions in the area. Such a rationale applies equally to the nuns. Moreover, defendants have failed to introduce any persuasive evidence as to why the nuns are not as susceptible to the unsafe conditions as members of the general public. The facts that fewer nuns use the beach than members of the public would were there a public beach and that nuns do not swim for very long periods of time do not overcome the existence of unsafe conditions. Moreover, the claim that members of the public would intrude onto the private dry sand area in front of the convent if a public beach were to be established between 112th and 113th Streets does not justify a total exclusion of all members of the public from swimming. Such a concern can be protected by a more precisely drawn regulation. *See Lusardi, supra*, 86 N.J. at 231, 430 A.2d 881. Defendants cannot seek to maintain the tranquility of the beachfront for the benefit of members of the convent by excluding members of the public from the waters off the beach. Such a purpose is not consistent with the Public Trust Doctrine nor equal protection. Since I find that the conduct of the defendants impermissibly discriminates between members of the public and the nuns and lacks a rational basis, I conclude that defendants have violated the equal protection rights of plaintiff.

██ Defendants have sought to regulate the placement of swimming beaches in

the Borough of Stone Harbor. While neither the Public Trust Doctrine nor the statute delegating the state's power to regulate lands bordering on the ocean require the borough to maintain beaches at every possible location in Stone Harbor, the limitations which a borough adopts to regulate the use of ocean waters must be reasonable. *Deal, supra,* 78 N.J. at 179, 393 A.2d 571. Municipal regulations are subject to challenge if arbitrary, capricious or unreasonable.

 In the instant case, the Borough Council has adopted an ordinance indicating that swimming may only take place at beaches where lifeguards are provided and that the location of such beaches shall be established by resolution of Council. However, the Council never apparently adopted a resolution designating swimming beaches until after trial of this action commenced. When the Council rejected plaintiff's petition for a beach at 113th Street, it relied on a number of recommendations of the Lifeguard Captain and the Beach Supervisor. The court has credited the testimony of the Lifeguard Captain and accepts the contention that the conditions at 113th Street do not favor public swimming. Council's reliance upon these recommendations is not unreasonable (so long as the swimming prohibition is applied to all equally). Council considered the public health and safety, proper considerations in determining the feasibility of establishing a swimming area. However, in light of the fact that no equivalent standards have ever been applied to the decision regarding the designation of protected beaches, the Council's decision is suspect. Council did not consider the safety of the 113th Street area in conjunction with a consideration of the safety of all other possible beach sites. Nor did it apparently reconsider this question during the course of trial when it passed a resolution designating beaches. Council never applied any identifiable standards to the decision of where to establish swimming beaches, but merely enacted a resolution which purported to make past practice official. Such action is purely arbitrary and cannot withstand a due process challenge. Accordingly, the resolution of Council adopted June 9, 1981 violates plaintiff's right to due process.

In conclusion, plaintiff has failed to carry her burden of establishing misrepresentation, ratification and grounds for estoppel. Accordingly, plaintiff's claims for injunctive relief and damages are denied. Plaintiff has demonstrated that the conduct of defendants violates the Public Trust Doctrine, equal protection and due process, and plaintiff is thus entitled to a declaratory judgment in her favor on these questions.

The accompanying order will be entered.